# United States Court of Appeals
## For the First Circuit

No. 04-1568

IRIS RIVERA, Individually and as Administratrix
of the Estate of Jennifer Rivera,

Plaintiff, Appellant,

v.

STATE OF RHODE ISLAND; CITY OF PROVIDENCE; EMILIO MATOS,
Individually; JOHN FINEGAN, Individually; RANDY WHITE,
Individually; GEORGE PAGE, Individually; URBANO PRIGNANO, JR.,
Individually and in his Official Capacity as Chief of Police for
the City of Providence; POLICE DEPARTMENT OF THE CITY OF
PROVIDENCE,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ernest C. Torres, U.S. District Judge]

Before

Lynch, Circuit Judge,
Campbell, Senior Circuit Judge,
and Howard, Circuit Judge.

Michael T. Eskey, with whom Amato A. DeLuca, Miriam
Weizenbaum, DeLuca & Weizenbaum Ltd., Nick Brustin, and Cochran,
Neufeld & Scheck, LLP were on brief, for Appellant.

Marc DeSisto, with whom Kathleen M. Daniels and DeSisto Law
were on brief, for Appellees Randy White and George Page.

Joseph F. Penza, Jr., with whom Martin K. DeMagistris and

Olenn & Penza, LLP were on brief, for Appellees Emilio Matos and John Finegan.

Kevin F. McHugh, Assistant City Solicitor, Providence Law Department, with whom Joseph M. Fernandez, City Solicitor, and Caroline Cole Cornwell, Assistant City Solicitor, were on brief, for Appellees City of Providence and Urbano Prignano, Jr.

March 22, 2005

**LYNCH**, <u>Circuit Judge</u>.  In May 2000, fifteen year old Jennifer Rivera was shot dead in front of her house in Providence, Rhode Island, to stop her from testifying at a murder trial that she saw Charles Pona, the defendant in the trial, fleeing from the scene of the murder of Hector Feliciano in August of 1999.  Her death has been avenged in one sense: Charles Pona, who ordered her murder, was convicted of her murder in state court.  Charles Pona was sentenced to life plus twenty years.

Iris Rivera, Jennifer's mother, seeks to avenge her daughter's death in another sense.  She filed a federal lawsuit alleging the police had violated Jennifer's constitutional substantive due process right to life by failing, after promising to do so, to protect Jennifer from the danger posed by Pona if she agreed to testify against him.  She sued the Providence Police Department (PPD); police officers Matos and Finegan and state Assistant Attorneys General White and Page, whom she said acted directly to compel Jennifer to testify; the Providence Police Chief Urbano Prignano for failing to train and properly supervise his officers; and the City for having a policy and practice of not protecting endangered witnesses who were given assurances of protection.[1]  In addition to her federal constitutional claims, the

---

[1]These are the defendants on appeal.  The defendants before the district court included the State of Rhode Island, the City of Providence, Police Officers Matos and Finnegan, Police Detective Morris, Rhode Island Attorney General Whitehouse, Assistant Attorneys General White and Page, Police Chief Urbano Prignano,

sole basis on which she is in federal court, Rivera brings claims under Rhode Island law.[2]

It would be inhumane not to feel a sense of outrage over Jennifer's death, or a sense of deep sympathy for Iris Rivera who has lost her daughter.  But our question is one of federal law, not one of sympathy.  The Supreme Court has said that only in very rare situations will the state's failure to protect someone amount to a constitutional violation, even if the state's conduct is grossly negligent.  The Court has cautioned that "[t]he doctrine of judicial self-restraint requires [courts] to exercise the utmost care whenever [they] are asked to break new ground in this field." Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992).  Based on the facts alleged in the complaint, we conclude that this is not one of those rare cases.

The most difficult analysis involves those constitutional claims against the police officers and state attorneys who made the promises.[3]  In fact, it may be that the officers made no promises

_____

Jr., and the Providence Police Department.  Defendants Morris and Whitehouse are not parties to this appeal.  The only claims against the State and Attorneys Page and White, in their official capacities, are state law claims.

[2]The district court dismissed these state law claims without prejudice.

[3]We add that while the issue of a claim of constitutional right is difficult, it is quite unlikely, for other reasons having to do with immunity doctrines and separate requirements for causes of action under 42 U.S.C. § 1983, that the claims against the defendants would have survived in any event.

or contingent promises at best. It may be that they intended to keep or tried to keep the promises, but were unable to guarantee Jennifer's safety. We do not know the defendants' version of the events. They chose to test the plaintiff's claims by motion to dismiss, so we must assume the truth of everything alleged by the plaintiff in the complaint. Still, we conclude that the plaintiff has not stated a claim of violation of Jennifer's federal constitutional rights. For that reason, the claims against all defendants were properly dismissed. Whether the plaintiff has some recompense under the laws of Rhode Island is another matter for Rhode Island to decide. Whatever recompense there can be to Jennifer and Iris Rivera, it is not to be found in this case.

We explain our reasons, starting with the allegations in the complaint.

**I.**

We look only to the allegations in the complaint[4] and take them as true, as required in a Rule 12(b)(6) motion.

On August 28, 1999, Hector Feliciano was shot to death in a vacant lot next to Jennifer Rivera's home. Fifteen year old

---

[4]Under the district court's scheduling order of May 15, 2003, discovery started and was scheduled to close in December of that same year. Some reference to discovered material is in the record and the plaintiff has included her answers to interrogatories in the Appendix before this court. However, the defendants did not include discovered material in their motions to dismiss and the district court did not consider the discovered material. Accordingly, we do not either.

Jennifer Rivera, who lived at 95 Congress Street in Providence, Rhode Island, heard gun shots, went to her kitchen window, and saw a dark skinned man scale the fence of the lot and drive away in a sport utility vehicle. At the request of a Providence police officer, Jennifer went to the police station that same day and signed a witness statement.

On August 31, at the request of Feliciano's family, she went to the police station a second time. She signed another statement and identified Charles Pona from police photographs as the man she saw fleeing the crime scene. On October 28, 1999, Charles Pona was arrested for the murder of Feliciano. On November 1, 1999, he began serving a six-month sentence on unrelated charges.

Starting in November of 1999, Rivera was continually threatened with death if she agreed to testify as to the murder she witnessed. At this time, Jennifer and her mother informed Jennifer's counselor of the death threats that she had been receiving. The PPD and Providence police detectives were immediately notified of the threats against Jennifer's life if she were to testify about having witnessed the murder.

"[S]oon thereafter, the PPD repeatedly assured her she would be safe." The PPD also informed defendants White and Page, prosecutors in the Attorney General's office, of the threats against Jennifer.

-6-

Based on these promises of protection, Jennifer agreed to and did testify at the grand jury hearing on November 15, 1999.

Another fifteen year old boy testified at this grand jury hearing as well, apparently also identifying Pona. That evening a passenger in an automobile pointed a gun at this boy's sister and asked where her brother was. Upon learning of these threats, the PPD placed the boy in a witness protection program that same day.

The threats against Jennifer's life, if she agreed to testify against Pona, continued. Specifically, Police Detectives Matos and Finegan were repeatedly informed of the death threats made against Jennifer. On November 23, 1999, Detective Finegan confirmed that he had received the information regarding the threat and indicated that he would speak with Jennifer. In January 2000, a detective of the PPD contacted Jennifer's counselor to confirm that he was aware of the threats against Jennifer's life as a result of her willingness to testify about having witnessed the murder.

On March 1, 2000, Charles Pona was indicted on charges of murdering Hector Feliciano, and on April 22, 2000, he was released on bail after completing his six-month sentence on unrelated charges. All defendants were aware of the release of Charles Pona.

On May 15, 2000, a subpoena was issued by defendants White and Page to Jennifer to appear in court at 9:30 on May 22 to testify in the murder trial of Charles Pona. White and Page were

-7-

aware of the threats being made against Jennifer's life if she agreed to testify. On May 16, the PPD notified Jennifer that she was required to testify on May 22, 2000. As late as May 17, 2000, Jennifer told the defendants White and Page and a PPD detective that she was afraid to go to court because she would be killed. Again, the defendants promised to protect her in order to secure her testimony.

As a result of the promises for protection, Jennifer continued in her willingness to testify to what she had seen on the day of the murder and to identify Charles Pona at trial as the killer of Feliciano.

On May 21, 2000, Jennifer Rivera was standing in front of her house when a young man with a hooded shirt stepped out of a car, grabbed her, and shot her in the head. Dennard Walker, Pona's half brother, shot Jennifer and was convicted for her murder. On November 12, 2003, Charles Pona was convicted of Jennifer's murder and conspiracy to commit murder because he had ordered Jennifer killed.

The complaint alleges that despite the repeated threats to Jennifer's life, her repeated requests for protection, and the defendants' repeated assurances that they would protect her, the defendants took no action to protect Jennifer including, among other things, failing to place her in the state's witness protection program. Rivera alleged that the defendants undertook

a duty to protect Jennifer by identifying her as a witness to the murder and taking her statement, promising to protect her if she testified, and subpoenaing her to testify before the grand jury and at the trial of Charles Pona, "knowing that she was reluctant to testify without such protection because of the repeated death threats she had received."

The complaint also alleges that the City of Providence and the PPD maintain legally inadequate training and supervision of employees, including the individual defendants, for protecting witnesses.

Rivera alleged in the complaint that by failing to protect Jennifer the defendants acted with "deliberate indifference to [Jennifer's] constitutional rights" and that the defendants' conduct "shocks the conscience."

**II.**

Defendants Matos, Finegan, White, and Page

A. Standard of Review

With respect to defendants Matos, Finegan, White, and Page, the district court dismissed the case against them for failure to state a claim under Fed. R. Civ. P. 12(b)(6). This court reviews de novo the district court's dismissal of Rivera's federal claims.

For civil rights cases, unless the statute specifies otherwise, there is no heightened pleading standard. Leatherman v.

<u>Tarrant County Narcotics Intelligence & Coordination Unit</u>, 507 U.S. 163, 168 (1993); <u>Educadores Puertorriqueños En Acción</u> v. <u>Hernàndez</u>, 367 F.3d 61, 66-67 (1st Cir. 2004). Thus in adjudicating motions to dismiss under Rule 12(b)(6), the district court must apply the notice pleading requirements of Rule 8(a)(2). <u>Educadores</u>, 367 F.3d at 66. Under that lenient rule, the complaint only needs to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." <u>Conley</u> v. <u>Gibson</u>, 355 U.S. 41, 47 (1957); <u>Educadores</u>, 367 F.3d at 66.

In considering a motion to dismiss for failure to state a claim, a court must take the allegations in the plaintiff's pleadings as true and must make all reasonable inferences in favor of the plaintiff. See <u>Pena-Borrero</u> v. <u>Estremeda</u>, 365 F.3d 7, 11 (1st Cir. 2004). A complaint may be dismissed for failure to state a claim "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." <u>Id.</u> (internal quotation marks omitted). Still, "notice pleading notwithstanding, Rule 12(b)(6) is not entirely a toothless tiger." <u>Educadores</u>, 367 F.3d at 67 (quoting <u>Dartmouth Review</u> v. <u>Dartmouth Coll.</u>, 889 F.2d 13, 16 (1st Cir. 1989)). In substantive due process cases, the Supreme Court has held that such claims must be carefully scrutinized to determine if the alleged

-10-

facts support the conclusion that the state has violated an individual's constitutional rights. See Collins, 503 U.S. at 125 ("It is important . . . to focus on the allegations in the complaint to determine how [the plaintiff] describes the constitutional right at stake" and what the police officers and state attorneys "allegedly did to deprive [the plaintiff's husband] of that right.").

This scrutiny of the complaint entails two separate inquiries. The first is whether the facts alleged state a claim for violation of constitutional rights. If such a claim is stated, there is a second inquiry as to whether the allegations meet the separate set of requirements as to particular categories of defendants to establish a claim within 42 U.S.C. § 1983, the statutory provision on which suit is brought. Because we find no cognizable claim of a violation of a constitutional right is stated, we uphold the dismissal of the case without reaching the second inquiry.

B.  The Existence of a Constitutional Violation

The due process guarantees of the Fourteenth Amendment forbid the State itself from depriving a person of life, liberty, or property, without due process of laws.

In order to establish a substantive due process claim, the plaintiff must first show a deprivation of a protected interest in life, liberty, or property. See Rhode Island Bhd. of

Correctional Officers v. Rhode Island, 357 F.3d 42, 49 (1st Cir. 2004); Macone v. Town of Wakefield, 277 F.3d 1, 9 (1st Cir. 2002). It is not enough to claim the governmental action shocked the conscience. See Washington v. Glucksberg, 521 U.S. 702, 722 (1997) (The implication of a fundamental right is a threshold requirement for establishing a due process violation). The complaint alleges that Jennifer was caused to be deprived of her life, a protected interest.

Second, the plaintiff must show that the deprivation of this protected right was caused by governmental conduct. That is easily met when a government actor causes the injury, such as when police officers act under color of law. See Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995) ("To be sure, violence is attributable to state action if the perpetrator is acting under color of state law."). It is much more difficult when the person who inflicts the injury is a private person. The Due Process Clause acts as a check on the government, not on actions by private individuals. Here, of course, the person who killed Jennifer was a private individual. Nonetheless, there are possible scenarios of government involvement with a private individual which amount to government conduct -- for example, if the police had handed the murderer the gun with instruction to shoot her, cf. Hemphill v. Schott, 141 F.3d 412, 418-19 (2d Cir. 1998), or assured Pona that he could attack Jennifer with impunity, cf. Dwares v. City of New

York, 985 F.2d 94, 96-97 (2d Cir. 1993). That is certainly not the case. The claimed governmental involvement in causing Jennifer's death was much more indirect: the government is said to have enhanced the danger posed by a private individual and then failed to protect against this risk.

The Supreme Court has stated that as a general matter, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 197 (1989). That is because the purpose of the Due Process Clause is to protect the people from the state, not to ensure that the state protects them from each other. "The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security," id. at 195, because "[t]he Framers were content to leave the extent of governmental obligation in the latter area to the democratic political processes," id. at 196.

However, the Court recognized that this general principle is not absolute: in situations in which there is a "special relationship," an affirmative, constitutional duty to protect may arise when the state "so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs." Id. at 200. "The affirmative duty to protect arises not from the State's knowledge

-13-

of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." Id. This court has recognized that this relationship, and thus a constitutional duty, may exist when the individual is incarcerated or is involuntarily committed to the custody of the state. See Monahan v. Dorchester Counseling Ctr., Inc., 961 F.2d 987, 991-92 (1st Cir. 1992).

The Supreme Court also suggested, but never expressly recognized, the possibility that when the state creates the danger to an individual, an affirmative duty to protect might arise:

> While the State may have been aware of the dangers that [the plaintiff] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. [By returning the plaintiff's child to his abusive father, the State] placed him in no worse position than that in which he would have been had it not acted at all.

DeShaney, 489 U.S. at 201 (emphasis added). From this statement comes Rivera's argument that the Due Process Clause is implicated when the state has played a role in creating the danger or has enhanced the danger to an individual.[5] At least three circuit courts have recognized the existence of a constitutional violation

---

[5]It is not clear from the "creation of danger" language in DeShaney whether a state action which enhances or creates danger to an individual would provide a separate exception to the general rule of no duty to protect, or whether the language is simply in service of the special relationship exception and provides a set of circumstances where the state's actions might create a "special relationship" and thus a duty to protect.

-14-

when, on particular facts, the state fails to protect against private violence under this state created danger theory. See Kallstrom v. City of Columbus, 136 F.3d 1055, 1066-67 (6th Cir. 1998); Reed v. Gardner, 986 F.2d 1122, 1125-26 (7th Cir. 1993); Wood v. Ostrander, 879 F.2d 583, 589-90 (9th Cir. 1989). One circuit has flatly rejected the theory. See Beltran v. City of El Paso, 367 F.3d 299, 307 (5th Cir. 2004). Other circuits have discussed the theory. See Pinder v. Johnson, 54 F.3d 1169, 1175-76 (4th Cir. 1995) (en banc).

This court has, to date, discussed the state created danger theory, but never found it actionable on the facts alleged. See Coyne v. Cronin, 386 F.3d 280, 287 (1st Cir. 2004) (stating that the "Due Process Clause may be implicated where the government affirmatively acts to increase the threat to an individual of third-party private harm"); Hasenfus v. LaJeunesse, 175 F.3d 68, 73 (1st Cir. 1999) ("Where a state official acts so as to create or even markedly increase a risk, due process constraints may exist, even if inaction alone would raise no constitutional concern."); Frances-Colon v. Ramirez, 107 F.3d 62, 64 (1st Cir. 1997) (recognizing that a government employee can in a "rare and exceptional case, affirmatively act[] to increase the threat of harm to the claimant or affirmatively prevent[] the individual from receiving assistance"); Soto v. Flores, 103 F.3d 1056, 1063-64 (1st Cir. 1997) (discussing, as a possible exception to the general

-15-

<u>DeShaney</u> rule, a substantive due process violation when the state, through its affirmative acts, creates or greatly enhances the danger faced by the plaintiff from third parties); <u>Souza</u> v. <u>Pina</u>, 53 F.3d 423, 427 (1st Cir. 1995); <u>Monahan</u>, 961 F.2d at 992-93.

Even if there exists a special relationship between the state and the individual or the state plays a role in the creation or enhancement of the danger, under a supposed state created danger theory, there is a further and onerous requirement that the plaintiff must meet in order to prove a constitutional violation: the state actions must shock the conscience of the court. <u>See</u> <u>Hasenfus</u>, 175 F.3d at 73 (In a state created danger case, state behavior must be "conscience-shocking or outrageous"); <u>see</u> <u>also</u> <u>Coyne</u>, 386 F.3d at 287-88 (using "shocks the conscience" as a catch-all term encompassing a range of state actor behavior); <u>Soto</u>, 103 F.3d at 1064 ("Not every negligent, or even willfully reckless, state action that renders a person more vulnerable to danger 'take[s] on the added character of [a] violation[] of the federal Constitution.'") (quoting <u>Monahan</u>, 961 F.2d at 993) (alterations in <u>Soto</u>).

In determining whether the state has violated an individual's substantive due process rights, a federal court may elect first to address whether the governmental action at issue is sufficiently conscience shocking. <u>See</u> <u>County of Sacramento</u> v. <u>Lewis</u>, 523 U.S. 833, 847 n.8 (1998). The state action must be "so

-16-

egregious, so outrageous, that it may fairly be said to shock the contemporary conscience."  Id.  "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."  Id. at 849 (emphasis added).  Of course, whether behavior is conscience shocking varies with regard to the circumstances of the case.  See id. at 850-52.  In situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to "shock the conscience."  See id. at 851-52.

Keeping all of this in mind, we echo the caution articulated in Soto: in a state creation of risk situation, where the ultimate harm is caused by a third party, "courts must be careful to distinguish between conventional torts and constitutional violations, as well as between state inaction and action."  Soto, 103 F.3d at 1064.

C. Rivera's Allegations

The federal claims dismissed as to defendants Matos, Finegan, White, and Page are alleged in counts one and two.[6] Specifically Rivera alleges in the complaint that the defendants undertook a duty to protect Jennifer and that the defendants

---

[6]Count eight was brought by Rivera against all defendants for deprivation of her own constitutional rights.  This count was dismissed in an earlier order by the district court on March 4, 2004, and Rivera is not appealing its dismissal.

-17-

enjoyed a special relationship with Jennifer. The acts and omissions of the defendants and their failure to take appropriate steps to protect Jennifer from the risk that Pona posed to her, despite her requests for protection, violated her substantive due process rights.[7]

Although not clear from the complaint, Rivera's objections to the motions to dismiss and supporting memorandum clarify that in addition to the duty which arises in the context of a special relationship between Jennifer and the state,[8] the two counts are premised on an alleged separate duty to protect Jennifer based on the defendants' actions which enhanced the danger to her. Rivera has essentially conceded, by dropping her special relationship claim on appeal, that she cannot establish such a relationship. The factual circumstances, as alleged in the complaint, also do not amount to the type of state creation of risk contemplated by the doctrine. The actions of the defendants are "not the kind of 'affirmative acts' by the state that would give

---

[7]In count one of her complaint, Rivera also alleges that Prignano, along with Officers Matos and Finegan, is liable for the underlying substantive due process violation. On appeal, Rivera does not allege that Prignano participated in the conduct which created the danger. Rivera's only theory of liability as to Prignano is supervisory liability.

[8]The special relationship exception is not relied upon by the plaintiff on appeal, although it appears to be the basis for the duty alleged in the complaint. Before the district court, Rivera also alleged a due process violation based on the defendants' failure to properly apply the State's witness protection program. This argument is not presented on appeal.

rise to a constitutional duty to protect." Souza, 53 F.3d at 427.

As to Officers Matos and Finegan, Rivera argued that the danger was created as a result of their actions of identifying and securing Jennifer as a witness, providing her with false assurances of protection upon which she relied,[9] compelling her to act in this capacity as a witness, and by issuing a subpoena to her to confront Pona in open court.

As to defendants White and Page, Rivera argued that the danger was created as a result of their promising to protect Jennifer if she testified and subpoenaing her to testify before the grand jury and at the trial of Charles Pona, knowing that she was reluctant to testify without such protection because of the repeated death threats.

Rivera argues the state's two actions in identifying Jennifer as a witness and taking her witness statement in the course of investigating a murder compelled Jennifer to testify and thus enhanced the danger to Jennifer. Both are necessary law enforcement tools, and cannot be the basis to impose constitutional liability on the state.

---

[9]The complaint does not allege that Matos or Finegan ever actually spoke to Jennifer or promised her protection. The complaint states that Matos and Finegan knew of the threats and indicated that they would speak with her, but there are no allegations that Matos or Finegan actually spoke with her. However, in her motions and in her brief before this court, she does allege that Detective Matos promised her protection.

Rivera also argues issuance of a subpoena enhanced the risk to Jennifer. Issuing a subpoena is also a vital prosecutorial tool. While requiring Jennifer's testimony may in fact have increased her risk, issuance of a subpoena did not do so in the sense of the state created danger doctrine. Every witness involved in a criminal investigation and issued a subpoena to testify in a criminal proceeding faces some risk, and the issuance of a subpoena cannot become the vehicle for a constitutional claim against a state.

The only remaining "affirmative acts" alleged in the complaint are the defendants' assurances of protection.[10] There is no doubt that, if accepted as true, the complaint shows that Jennifer may have been subjected to an increased risk, if she was promised protection, not given it, and relied on the promise. The state, in making these promises, may have induced Jennifer into a

_____

[10]On appeal, Rivera argues for the first time that her case, against these four defendants, must be taken as stating the claim that they deliberately misled Jennifer, knowing she would rely on their false promise of protection and knowing that this protection would not be forthcoming. As a result, the risk to her was greatly enhanced, and became fatal when they subpoenaed her and left her without protection. As to the federal claims against these four defendants, intentional misrepresentation was neither alleged in the facts or claims section of the complaint. Also, intentional misrepresentation was not argued in the district court as part of the federal claims. "It is hornbook law that theories not raised squarely in the district court cannot be surfaced for the first time on appeal." McCoy v. Mass. Institute of Tech., 950 F.2d 13, 22 (1st Cir. 1991).

false sense of security, into thinking she had some degree of protection from the risk, when she had none from the state.

While the unkept promises may have rendered her more vulnerable to the danger posed by Charles Pona and his associates, merely rendering a person more vulnerable to risk does not create a constitutional duty to protect. See Souza, 53 F.3d at 427. In part this is because an increased risk is not itself a deprivation of life, liberty, or property; it must still cause such a deprivation.

Ultimately, the claims alleged in the complaint are indistinguishable from those in DeShaney. The allegation -- that Jennifer trusted the state to do what it said and relied on that promise in agreeing to testify -- is not materially different from DeShaney, where the state was aware of the risk, by its actions expressed promises of help, and then failed to protect a young boy from his abusive father.

DeShaney directs that a state's affirmative constitutional duty to protect an individual from private violence arises when there is some deprivation of liberty by state actors. See DeShaney, 489 U.S. at 200 ("The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf."). The state's promises, whether false or merely

unkept, did not deprive Jennifer of the liberty to act on her own behalf nor did the state force Jennifer, against her will, to become dependent on it.  See Monahan, 961 F.2d at 993 (finding no constitutional liability when the state did not force the plaintiff to become dependent on the state).  Moreover, the state did not take away Jennifer's power to decide whether or not to continue to agree to testify.  Merely alleging state actions which render the individual more vulnerable to harm, under a theory of state created danger, cannot be used as an end run around DeShaney's core holding.[11]

We add a few words about the separate shock the conscience test which plaintiff would also have to meet if she established a duty.  In part, the test is meant to give incentives to prevent such gross government abuses of power as are truly outrageous.  The facts here do not match the need for such

_____

[11]Rivera contrasts the situation involving false assurances with the alternative of the police not offering false promises.  If the police had, Rivera argues, told the truth, that they would not provide protection, Jennifer could have taken several different courses of action.  Jennifer might have chosen to cooperate, even in the absence of protection; she might have run away prior to the issuance of the subpoena; or she might have disregarded the subpoena and risked being held in contempt of court.  But the danger to Jennifer, in the absence of these false assurances, would still have been evident.  She would still have been identified by the police department as a witness to the murder; she would still have given a statement to the police about what she saw; she would still have, at the request of the deceased's family, given a second statement and identified Pona; and the state would have still issued a subpoena for her to testify before the grand jury and at the trial.

incentives. Intimidation and even murder of witnesses is a growing national problem in major urban areas, plaguing witnesses, law enforcement officers, and the communities. It is in the interests of the police to protect witnesses, in order to secure convictions. There can be any number of common reasons why police protection of witnesses is ineffectual, none of which involve acts by the police intended to cause the murder of a needed witness. Cf. County of Sacramento v. Lewis, 523 U.S. 833, 855 (1998). Of course, there may be an extreme set of facts involving such deliberate and malevolent actions by police against witnesses as to shock the conscience and implicate a constitutional violation. Those await another day.

**III.**

Defendant City of Providence and Former Police Chief Urbano Prignano

Since the plaintiff has failed to state a constitutional claim at all, her claims against the other defendants for supervisory liability and for failure to train fail. See City of Canton v. Harris, 489 U.S. 378, 391 (1989) (The city's constitutional liability for failure to train or for inadequately training its employees is premised on there being an underlying constitutional violation of the harmed individual's rights.); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581-82 (1st Cir. 1994) (To establish supervisory liability, the plaintiff must show an underlying constitutional violation.).

-23-

**IV.**

<u>Conclusion</u>

We **<u>affirm</u>** the dismissal of all claims. The federal claims are dismissed with prejudice. The dismissal of the pendent state claims is without prejudice. No costs are awarded.