# United States Court of Appeals
## For the First Circuit

No. 15-2174

CHRISTINE MORGAN, next friend and mother of minor, R.M.,

Plaintiff, Appellant,

v.

TOWN OF LEXINGTON, MA; LEXINGTON PUBLIC SCHOOLS; DR. PAUL ASH, Superintendent, in his official and individual capacities; DR. STEVEN FLYNN, Principal, in his official and individual capacities,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Lynch, Kayatta, and Barron,
Circuit Judges.

Timothy M. Burke, with whom Jared S. Burke and Law Offices of Timothy M. Burke were on brief, for appellant.
John J. Cloherty III, with whom Pierce, Davis & Perritano, LLP was on brief, for appellees.

May 23, 2016

**LYNCH**, **Circuit Judge**.  The district court granted a motion to dismiss brought by the Town of Lexington, Massachusetts ("Lexington"), Lexington Public Schools ("LPS"), its superintendent, and a principal (collectively "the defendants"), ending a civil rights suit filed by a mother, Christine Morgan, who complained that the defendants inadequately responded to the bullying of her son, R.M., by his middle school peers, in violation of his federal substantive due process rights.  Five pendant state law claims were also dismissed, and a motion to add a second federal law claim under Title IX was denied.

The complaint relied upon a theory once suggested by the United States Supreme Court that when the state creates a danger to an individual, an affirmative duty to protect might arise.  Noting that this court has never squarely accepted such a theory, not having been presented with facts supporting a claim, the district court held that the facts presented here simply do not give rise to a substantive due process violation.  We agree.  We also agree that the conduct alleged does not fall within the scope of Title IX, which is concerned with actions taken "on the basis of sex," see 20 U.S.C. § 1681(a), and not undifferentiated bullying.  We affirm.

I.

We draw the facts from Morgan's original and amended complaints "and the documents incorporated therein." Ouch v. Fed.

Nat'l Mortg. Ass'n, 799 F.3d 62, 64 (1st Cir. 2015).  Where the complaint characterizes a document, we refer to the document.  We do not attempt to cover all the facts, only those directly pertinent to the issues.

In the fall of 2011, R.M. was a twelve-year-old student at a middle school located in Lexington, MA.  On or about October 5, 2011, several students pulled R.M. to the ground and beat him, repeatedly kicking and punching him in the head and stomach.  This was captured on a video given to the administration.  The school investigated.  The next day, the principal, Steven Flynn, discussed the incident with Morgan.  He told Morgan that the incident involved a group of students, known as the "Kool-Aid Club," and that R.M. had at first agreed to the beating by the students as part of an initiation into their group.  He said that R.M. was not the aggressor and that R.M. was not in trouble but that he was not happy with R.M. because he "delay[ed] the investigation."  He told Morgan that because of R.M.'s conduct during the investigation, R.M. would not be allowed to participate in an upcoming school track meet.

On October 17, one of the students who had been part of the Kool-Aid Club incident said to R.M., "You (R.M.) dummy, you got us in trouble."  R.M. was told they would "get him back" for getting them in trouble.  R.M. reported the statements to the assistant principal, who told him to stay away from those students.

During the fall of that year, students repeatedly called R.M. "Mandex Man," "thunder thighs," and "hungry hippo." R.M. was "pushed, tripped, punched or verbally assaulted while walking in school hallways." R.M. was also "table topped," in which "one person gets down on all fours behind the victim to push the victim behind the knees, and then one or two other individuals push the victim so that the victim falls backwards." "[O]n multiple occasions R.M. had his pants pulled down in front of other students (male and female), while on school grounds . . . ." On December 21, R.M. was also pushed into a locker, "which caused him to break his watch."[1]

On December 22, 2011, Morgan emailed Principal Flynn that R.M. did not feel safe at school and was scared to report bullying for fear of retaliation by his peers. She referred to the school's anti-bullying policy and the state's anti-bullying statute.[2] The complaint alleges that Principal Flynn replied by

---

[1] The complaint includes other incidents from 2012, such as R.M. having "his lunch and belongings strewn onto the floor" by another student and R.M. finding a Facebook page titled "I hate R.M." that students at his school had "liked."

[2] In 2010, Massachusetts enacted anti-bullying legislation, codified at Massachusetts General Laws ch. 71, § 37O. The statute prohibits bullying on school grounds, id. § 37O(b) and requires that school districts "develop, adhere to and update a plan to address bullying prevention and intervention," id. § 37O(d)(1). The record suggests that LPS has developed such a plan. Of note, however, the legislature made the choice not to "create a private right of action" through the statute. Id.

email that the school could not investigate the allegations unless R.M. himself reported the bullying. What Principal Flynn actually said in the reply email was, "Is it possible for you to bring [R.M.] in this morning to meet with [school administrators] to hear from him the concerns? This will enable us to take action on the issues."

On December 23, Morgan met with school officials and reported new information that R.M. had recently given her. This included R.M.'s general fear of retaliation for having reported some students and specific retaliation from one of the boys who had attacked him. She gave the school sufficient information to start to investigate the allegations. The school official responded that the school would investigate. And at least by January 20, 2012, it did.

On January 2, 2012, R.M. again expressed fear that he would be bullied and refused to go to school. When R.M. did not show up to school on January 4, 2012, as required by state law, see Mass. Gen. Laws ch. 76, § 1, Principal Flynn directed at least one officer of the Lexington Police Department to go to R.M.'s house. Morgan represented to us that the officer(s) went to R.M.'s house that day, and that R.M. "viewed this act to be a threat by Defendant Principal Flynn to intimidate and coerce him to come

§ 37O(i). Morgan alleges that several of the school's actions contradict LPS's anti-bullying policy.

back to school." On January 5, 2012, R.M. again did not show up at school; two officers again went to R.M.'s house to talk with his mother, and R.M. "experience[d] a panic attack."

Morgan met several times with school administrators about her concerns for R.M. During a January 6, 2012, meeting with the assistant principal and a school social worker, Morgan and R.M. were told that there was not time then to discuss specific allegations. Principal Flynn investigated R.M.'s allegations and on January 20, 2012, reported that a student had admitted to pulling down R.M.'s pants,[3] and that others had confirmed that R.M. had been "table-topped." The complaint alleges that Principal Flynn told Morgan that none of the students involved would be disciplined.

In late February 2012, Morgan decided to enroll R.M. in a private school, where he finished the school year.

Morgan reenrolled R.M. at the public school at issue here on October 9, 2012. R.M. continued to experience anxiety about attending there and as a result "missed 112 days of school from October 9, 2012, through the remainder of the school year."

---

[3] The complaint never alleges what R.M. was wearing under the pants that were pulled down. At oral argument, counsel for the defendants noted that fact and referred to the documents Morgan attached to her complaint as supporting an inference that, at least during one incident of "pantsing," R.M. had on his gym shorts under his pants and was not "exposed."

On October 3, 2014, Morgan filed a complaint in federal court against the defendants, alleging (1) a violation of R.M.'s substantive due process rights under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 ("§ 1983") against all defendants; (2) negligence against all defendants; (3) intentional infliction of emotional distress against the superintendent and principal; (4) negligent infliction of emotional distress against both men; (5) negligent hiring, training, and supervision against Lexington and LPS; and (6) violations of the Massachusetts Civil Rights Act against all defendants.  The relief sought was compensatory as well as multiple and/or punitive damages for the alleged failure of the defendants to respond appropriately to the bullying.  The defendants moved to dismiss for failure to state a claim.  See Fed. R. Civ. P. 12(b)(6).  Morgan moved to amend her complaint to include a Title IX claim.  See Fed. R. Civ. P. 15(a).  On September 24, 2015, the district court allowed the defendants' motion and denied Morgan's motion as futile.  This appeal followed, in which Morgan challenges the dismissal of her § 1983 substantive due process claim and the denial of her motion to amend with the Title IX claim.

## II.

We review the dismissal of Morgan's complaint de novo, accepting as true all well-pleaded facts and drawing all reasonable inferences in her favor.  Haley v. City of Boston, 657 F.3d 39, 46

(1st Cir. 2011).  "We review denials of motions to amend pleadings for abuse of discretion," Adorno v. Crowley Towing & Transp. Co., 443 F.3d 122, 126 (1st Cir. 2006), and "[f]utility of the amendment constitutes an adequate reason" for a district court to deny such a motion, Todisco v. Verizon Commc'ns, Inc., 497 F.3d 95, 98 (1st Cir. 2007).  "In assessing futility, the district court must apply the standard which applies to motions to dismiss under Fed. R. Civ. P. 12(b)(6)."  Adorno, 443 F.3d at 126.

A.   § 1983 Substantive Due Process Claim

Morgan's § 1983 claim contends that the defendants deprived R.M. of a "protected liberty interest in bodily integrity, specifically, the right to be free from the abuse and injuries" related to the bullying he endured, in violation of his substantive due process rights protected under the Fourteenth Amendment.[4]  To establish a substantive due process claim, a plaintiff must show not only a deprivation of a protected right but also that "the deprivation of this protected right was caused by governmental conduct."  Rivera v. Rhode Island, 402 F.3d 27, 34 (1st Cir. 2005).  In general, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due

---

[4]   We will not address Morgan's new arguments on appeal that R.M. has a protected property interest in free public education, or that the defendants violated his equal protection rights, neither of which were alleged in the complaint.  See Gonzalez-Morales v. Hernandez-Arencibia, 221 F.3d 45, 51 n.7 (1st Cir. 2000).

Process Clause." DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989).

Two of our earlier cases affirming dismissal of substantive due process claims involving juveniles, Hasenfus v. LaJeunesse, 175 F.3d 68, 71-74 (1st Cir. 1999); Rivera, 402 F.3d at 35-38, put the instant case into context. In Rivera, a fifteen-year-old girl witnessed a murder and had been told explicitly that she would be protected by police if she agreed to testify. 402 F.3d at 31. She agreed; she was not protected; and she was murdered. Id. at 32. We explained that it is not enough to allege something shocked the conscience. Id. at 34. The plaintiff had to show that governmental conduct caused the deprivation of the right. Id. We said:

> [T]he purpose of the Due Process Clause is to protect the people from the state, not to ensure that the state protects them from each other. "The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security," [DeShaney, 489 U.S. at 195], because "[t]he Framers were content to leave the extent of governmental obligation in the latter area to the democratic political processes," id. at 196 . . . .

Id. (third alteration in original).

Even closer to the facts of this case is our decision in Hasenfus, where a fourteen-year-old student who received a reprimand from her teacher attempted to commit suicide in an unattended locker room. 175 F.3d at 69-70. The suit, like this

one, named school officials as defendants and specifically alleged a substantive due process violation from their failure to take steps to prevent the suicide attempt given that the officials knew that the student had been raped the year before and that there was a recent rush of student suicide attempts. Id. In that case, the plaintiffs argued that the school had a relationship with the student such that it owed her a "special duty of care." Id. at 71. Under that theory, set forth by the Supreme Court in DeShaney, an affirmative duty to provide protection or care might arise when the government "so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs." 489 U.S. at 200; see Rivera, 402 F.3d at 34. In response to the plaintiffs' argument in Hasenfus, our court noted that:

> The Hasenfuses' position is especially difficult to accept outright since the Supreme Court has come pretty close to rejecting it in a recent dictum which specifically contrasted DeShaney: "[W]e do not, of course, suggest that public schools as a general matter have such a degree of control over children as to give rise to a constitutional 'duty to protect.'"

175 F.3d at 71–72 (alteration in original) (quoting Vernonia Sch. Dist. v. Acton, 515 U.S. 646, 655 (1995)).

Importantly, we explained "we are loath to conclude now and forever that inaction by a school toward a pupil could never give rise to a due process violation [, as] [f]rom a commonsense

- 10 -

vantage, [the student] is not just like . . . the young child in DeShaney who was at home in his father's custody and merely subject to visits by busy social workers who neglected to intervene." Id. at 72. So, too, here. In any event, however, Morgan has not alleged the "pungent facts" that would be required to show that any behavior by school officials was "so extreme as to 'shock the conscience.'" Id. (quoting Cty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1952)).

Morgan also asserts that her claim falls within the state created danger theory, which may be implicated "[w]here a state official acts so as to create or even markedly increase a risk" to an individual, id. at 73; see also Coyne v. Cronin, 386 F.3d 280, 287 (1st Cir. 2004) ("[T]he Due Process Clause may be implicated where the government affirmatively acts to increase the threat to an individual of third-party private harm or prevents that individual from receiving assistance." (citations omitted)).

Morgan argues that the defendants and other school employees allegedly "turned a blind eye" to the bullying of R.M. "and took affirmative steps to disregard Plaintiff's complaints and permit the ongoing sexual harassment and bullying," which "materially contributed to creating the specific condition or situation that caused R.M.'s injuries." The "affirmative steps" Morgan points to include Principal Flynn's "punishment" of not letting R.M. run in the track meet because he delayed the

- 11 -

investigation after the October 5, 2011, Kool-Aid Club incident; sending officers to R.M.'s house; and a school official telling Morgan and R.M. at a meeting that there was not time to discuss specific incidents.[5]  These acts certainly did not create a new danger.  See Morrow v. Balaski, 719 F.3d 160, 178 (3d Cir. 2013) (en banc).  And Morgan offers no explanation for how the acts caused R.M. to be bullied or increased the risk to him.  See Stiles ex rel. D.S. v. Grainger Cty., Tenn., No. 15-5438, 2016 WL 1169099, at *15 (6th Cir. Mar. 25, 2016).  An alleged failure of the school to be effective in stopping bullying by other students is not action by the state to create or increase the danger.  These routine acts of school discipline, truancy enforcement, and administrator-parent conferences are not the vehicle for a substantive due process constitutional claim.  Cf. Rivera, 402 F.3d at 37 (noting that "[w]hile requiring [the girl]'s testimony may in fact have increased her risk, issuance of a subpoena did not do so in the sense of the state created danger doctrine," as "[e]very witness involved in a criminal investigation and issued a subpoena to testify . . . faces some risk, and the issuance of a subpoena cannot become the vehicle for a constitutional claim

---

[5]     Morgan also asserts that a school behavioral specialist was instructed to "illegally alter[] the diagnosis of [R.M.] in an attempt to avoid any potential liability," but she fails to develop any argument connecting that act to bullying toward R.M., and as such, we deem the issue waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

against a state").  Moreover, viewing these acts as inaction does not help Morgan's argument.  See Hasenfus, 175 F.3d at 72.  The alleged acts in Morgan's complaints here simply do not approach the threshold of a state-created danger.[6]  See Rivera, 402 F.3d at 35 (collecting this circuit's cases finding no actionable set of facts).  As such, Morgan's claim fails.

B.  Title IX Claim

Title IX of the Education Amendments of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  See 20 U.S.C. § 1681(a).  An implied right of action for such claims lies only "against the educational institution itself."  Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 65 (1st Cir. 2002).

---

[6]  At oral argument, Morgan's counsel heavily relied on the truancy officers' visit to R.M.'s house.  Counsel asserted that "when the school takes under the color of law to send police officers to [R.M.'s home], it then is doing something that . . . is a compulsory control."  To the extent counsel was arguing that an affirmative duty to protect arises because the school was telling R.M. that he was obliged to return to school, we reject the contention.  Compulsory attendance laws "are necessary . . . enforcement tools," and by themselves "cannot be the basis to impose constitutional liability on the state."  Rivera, 402 F.3d at 37.  A rule otherwise would enervate the truancy enforcement capacities of an education system.  See Mass. Gen. Laws ch. 76, § 1 ("The school committee of each town shall provide for and enforce the school attendance of all children actually residing therein in accordance herewith.").

Sexual harassment in schools can constitute prohibited sex-based discrimination actionable under Title IX where there is a "hostile environment," such that "acts of sexual harassment [are] sufficiently severe and pervasive to compromise or interfere with educational opportunities normally available to students," and relevant school officials with actual knowledge of the harassment "exhibit[] deliberate indifference to [the harassment]." Id. at 65, 66. Student on student harassment can be actionable. Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ., 526 U.S. 629, 643 (1999). The purportedly illegal acts must be taken "on the basis of sex." See Frazier, 276 F.3d at 66 ("Discrimination on the basis of sex is the sine qua non of a Title IX sexual harassment case, and a failure to plead that element is fatal."). However, "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998).

Morgan points to the allegation that R.M.'s pants were pulled down on one occasion in front of a girl, and on some unspecified number of other occasions not described as being in front of any girls.[7] One might perhaps view such conduct as

_____

[7] Morgan's amended complaint includes one reference to R.M. being "sexually assaulted while at school" and one reference to R.M. receiving "death threats." Neither allegation includes any "factual content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and where

- 14 -

harassment "on the basis of sex" depending on the context. Here, however, no such inference is plausible. Morgan's complaint does not allege any sex- or gender-based animus by any of the students, and none can be inferred from the circumstances outlined in the complaint.

Moreover, the pulling down of the pants by and large seems clearly to be an adjunct to the bullying on the basis of other considerations, and by itself is not portrayed in the complaint as sufficiently "severe" and/or "pervasive" to supply a sexual harassment claim under Title IX. See Davis, 526 U.S. at 643 (finding that liability arises only when the school is deliberately indifferent to sexual harassment that is "severe, pervasive, and objectively offensive"). Even if in some cases one could "use a substantial amount of arguably gender-neutral harassment to bolster a smaller amount of gender-based conduct," as Morgan suggests, such an inference is not reasonable here, where there is only one incident that can even arguably be deemed sex-based. Morgan's citation to Chavez v. New Mexico, 397 F.3d 826 (10th Cir. 2005), a workplace sex harassment suit in which the

---

factual allegations "are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture," we cannot credit them, SEC v. Tambone, 597 F.3d 436, 442 (1st Cir. 2010) (en banc).

- 15 -

"[p]laintiffs allege[d] a number of gender-based incidents," id. at 833, is therefore inapposite.

Morgan also attempts to rely on an unpublished per curiam Fifth Circuit opinion, Carmichael v. Galbraith, 574 F. App'x 286 (5th Cir. 2014) (per curiam), which found that "[t]he removal of a person's underwear without their consent on numerous occasions plausibly constitutes pervasive harassment of a sexual character," id. at 29. But the case is readily distinguishable because the instant case lacks the "constellation of surrounding circumstances," id. at 290 (quoting Davis, 526 U.S. at 651), that the Carmichael court underscored in finding actionable sex-based conduct, including that the boy was "accosted by a group of boys in the locker room -- oftentimes having his underwear removed -- while [one of the defendants] observed"; and "members of the football team 'stripped [the boy] nude and tied him up' and 'placed [him] into a trash can' while calling him 'fag,' 'queer,' and 'homo,'" id. at 288.

As such, it was not an abuse of discretion for the district court to determine that amendment of the complaint would be futile.

### III.

We affirm the district court's dismissal of Morgan's complaint and the denial of her motion to amend. No costs are awarded.

- 16 -