# United States Court of Appeals
## For the First Circuit

No. 24-1419

JOHN DOE; JANE DOE; and JAMES DOE,

Plaintiffs, Appellants,

v.

CITY OF BOSTON; PAUL EVANS, individually; ROBERT DUNFORD,
individually; MELBERT AHEARN, individually; ANNE MARIE DOHERTY,
individually; LADONNA HATTON, individually; EILEEN VANDERWOOD,
individually; JOHN MCLEAN, individually; MARIE DONAHUE,
individually; BOSTON POLICE PATROLMAN'S ASSOCIATION; THOMAS NEE,
individually; PATRICK ROSE, SR., individually; FRANCES ROSE;
GAIL SULLIVAN, individually; SHERYL HILLIARD, individually;
RAYMOND SMITH, individually; RUDOLPH ADAMS, individually; and
BOSTON POLICE DEPARTMENT,

Defendants, Appellees,

MASSACHUSETTS DEPARTMENT OF CHILDREN AND FAMILIES; DCF DEFENDANT
DOES 1-5, individually; BPD DEFENDANT DOES 1-5, individually;
and BPPA DEFENDANT DOES 1-5, individually,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor, IV, Chief U.S. District Judge]

Before

Barron, Chief Judge,
Thompson and Rikelman, Circuit Judges.

Patrick Driscoll, Janine D. Kutylo, and Anthony M. Buonopane,

with whom Boyle Shaughnessy Law was on brief, for appellants.

Edward F. Whitesell, Jr., Senior Assistant Corporation Counsel, with whom Adam D. Johnson, Senior Assistant Corporation Counsel, and City of Boston Law Department were on brief, for appellees City of Boston, Paul Evans, Robert Dunford, Melbert Ahearn, Anne Marie Doherty, LaDonna Hatton, Eileen Vanderwood, John McLean, and Marie Donahue.

Thomas Donohue, with whom Leonard H. Kesten and Brody, Hardoon, Perkins & Kesten, LLP were on brief, for appellees Boston Police Patrolman's Association and Thomas Nee.

John B. Kulevich, with whom The Law Offices of John B. Kulevich, LLC was on brief, for appellee Frances Rose.

———————————

July 25, 2025

———————————

**RIKELMAN**, **Circuit Judge**.  From 1990 to 1999, Patrick Rose, Sr., a police officer with the Boston Police Department (BPD), sexually abused two children, John and Jane Doe.  Rose ultimately pled guilty to 21 counts of child rape and sexual assault in April 2022.  The Does, now adults, then sued Rose, the BPD, and a number of other defendants who played a role in the investigation and response to their sexual abuse allegations against Rose in the 1990s.  Their primary claim was that the defendants had deprived them of their Fourteenth Amendment right to bodily integrity by affirmatively enhancing the danger to John and Jane from Rose's abuse.

The district court dismissed the case before any discovery.  It concluded that the defendants could not be held responsible under what is known as the state-created danger doctrine, because the Does had not sufficiently alleged that the defendants' actions had enhanced Rose's abuse and caused them harm.  It also dismissed the Does' remaining claims.

We vacate the district court's decision as to the Does' Fourteenth Amendment claims only.  We conclude that the Does plausibly alleged that at least some of the defendants' actions enhanced the danger to them, meeting the first requirement of the state-created danger test.  Thus, we remand for the district court to evaluate those actions under the test's remaining requirements.

## I. BACKGROUND

### A. Relevant Facts

In reviewing the district court's grant of the defendants' motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), we "'draw the facts from the complaint and its attachments,' taking the well-pleaded facts as true and construing all reasonable inferences in [the Does'] favor." Lawrence Gen. Hosp. v. Cont'l Cas. Co., 90 F.4th 593, 595 (1st Cir. 2024) (quoting Lanza v. Fin. Indus. Regul. Auth., 953 F.3d 159, 161 (1st Cir. 2020)).

#### 1. Initial Allegations and Criminal Investigation

As we described earlier, this case arises from Rose's sexual abuse of two young children, John and Jane Doe, while Rose was employed as a BPD police officer. Both children lived with Rose, who was married to their mother, Frances.[1] Rose sexually abused John Doe from approximately 1990 through 1997, when John was between eight and fourteen years old, and sexually abused Jane Doe from approximately 1990 through 1999, when Jane was between five and fourteen years old. Rose also sexually abused four other children who were family members from at least 1990 through 2020.

On November 8, 1995, the Massachusetts Department of Children and Families (DCF) received a report that Rose sexually

---

[1] We refer to Frances Rose, Rose's spouse, by her first name to avoid any confusion.

abused John Doe.  DCF accepted the report for investigation that same day.

Later that week, the BPD began its own investigation. Lieutenant Marie Donahue and Sergeant Detective John McLean of the BPD's Sexual Assault Unit were assigned to the case.  On November 10, they interviewed John Doe in a police car in front of Rose's home, while Rose and his wife Frances stood outside the home and watched.  During the interview, John told the officers that Rose had sexually abused him.  The BPD officers then arrested Rose for Indecent Assault and Battery on a Child Under 14 and prepared an internal BPD incident report regarding the abuse.  That same day, Rose was served with a restraining order barring him from contacting John, Jane, another child victim who was a family member, and a fourth minor, and then placed on administrative duty by BPD.  On November 11, the BPD confiscated Rose's weapons and license to carry a firearm.  A few days later, two of John's minor friends confirmed to Sgt. Det. McLean that Rose had forced John to touch him inappropriately multiple times.

After Rose's arrest, from November 13 to November 16, DCF employees conducted their interviews and investigation of John's sexual abuse allegations.  Lt. Donahue had previously instructed DCF not to visit the Rose home, "as the allegation pertained to a Boston Police officer."  She indicated that she would visit the home instead to avoid any potential harm to the

family, given that Rose was armed and could react in a hostile manner. Contrary to investigative protocols, Lt. Donahue also instructed DCF not to interview John again. The DCF employees followed her directive and interviewed Jane, but not John, in front of Frances. On November 16, DCF concluded that evidence supported the allegation that Rose had sexually abused John. It then referred the case to the district attorney.

Several days later, Sgt. Det. McLean filed a criminal complaint in state court against Rose for Indecent Assault and Battery on a Child Under 14. Rose was arraigned on that charge on December 1, 1995; he was represented by an attorney working for the local police union, the Boston Police Patrolman's Association (BPPA). At the arraignment, the court sentenced Rose to pre-trial probation for one year, until December 1, 1996, and ordered him to attend therapy directed by DCF.

Rose did not comply with the state court order to attend therapy or with the restraining order issued against him, but none of the defendants took any action in response. Instead, DCF consented to the withdrawal of the restraining order against Rose in January 1996, just two months after it was entered. Similarly, in February 1996, Anne Marie Doherty, the Superintendent-in-Chief of the BPD Office of Internal Investigations, and LaDonna Hatton, the BPD Legal Advisor, approved vacating the restraining order.

On May 7, 1996, the Commonwealth of Massachusetts dismissed the indecent assault and battery criminal complaint against Rose seven months before his pre-trial probation period was scheduled to end. The Commonwealth alleged that Rose had met the requirements of his pre-trial probation and that the victims were no longer willing to cooperate with the prosecution.

**2. BPD Internal Investigation and Reinstatement**

Meanwhile, in December 1995, Sergeant Detective Eileen Vanderwood of the BPD Internal Affairs Division (IAD) prepared an internal complaint against Rose based on the criminal charge against him for Indecent Assault and Battery on a Child Under 14. Five months later, in April 1996, the IAD ordered Rose to report for an interview. Sgt. Det. Vanderwood interviewed Rose in early June 1996, but Rose asserted his Fifth Amendment privilege and refused to provide information about the allegations.

The IAD sustained the complaint against Rose shortly after his interview, finding that he violated an internal BPD rule barring employees from "commit[ting] any criminal act." Under that BPD rule, violators "shall be subject to disciplinary action up to and including discharge from the Department." Yet none of the BPD officers investigated the allegations against Rose further, ordered or recommended disciplinary measures, or made a final disposition on the sustained complaint.

In May 1997, after Rose had been on administrative duty at the BPD for over a year, his BPPA attorney requested that he be reinstated to full duty and submitted affidavits from John and Frances recanting John's allegations of sexual abuse against Rose. In October 1997, Rose's attorney also filed a grievance with the Office of Labor Relations (OLR) for the City of Boston ("the City"), claiming that the BPD had no just cause for placing Rose on administrative duty. The OLR denied the grievance.

Even though the IAD sustained the sexual abuse complaint against Rose and the OLR found that the BPD appropriately placed Rose on administrative duty, BPD Commissioner Paul Evans reinstated Rose to full duty in May 1998, without imposing any sanctions. Rose served as a police officer for the next twenty years, until his retirement in 2018. Rose also was elected and served as the president of the BPPA from 2014 to 2018.

After John's 1995 complaint, Rose continued to sexually abuse John, Jane, and the four other child victims.

### 3. Renewed Criminal Complaint and Prosecution

In 2020, when John was in his late 30s, he again reported to the BPD that Rose had sexually abused him and four other victims when they were children. A Massachusetts grand jury returned an indictment with 33 counts of sexual abuse charges against Rose. And, in April 2022, Rose pled guilty to 21 counts of child rape and sexual assault and was sentenced to prison. John testified

during Rose's 2022 sentencing hearing that Rose's sexual abuse escalated after November 1995 because the City did nothing in response to John's report.

## B. Procedural History

In March 2024, John Doe, Jane Doe, and James Doe (Jane Doe's husband) filed an amended complaint against Rose, Frances, the City of Boston, individual BPD officers ("the BPD defendants"), the BPPA, individual BPPA employees, and individual DCF employees ("the DCF defendants").[2]  Counts 1-10 allege claims under 42 U.S.C. § 1983 against Rose, Frances, the BPD and DCF defendants, and the City for violations of the Does' substantive due process rights to bodily integrity.  Counts 11-15 allege claims under 42 U.S.C. § 1985 against the same defendants, as well as the BPPA and the individual BPPA defendants, on the ground that the defendants conspired to deprive the Does of their civil rights.  The remaining 28 counts allege state-law statutory claims and common-law claims. Most of the defendants moved to dismiss the amended complaint under Rule 12(b)(6).[3]

---

[2] The Does' initial complaint also included claims against DCF, but the Does voluntarily dismissed their claims against the agency in August 2023.  See Doe v. City of Bos., No. CV 23-11294, 2024 WL 1346018, at *6 (D. Mass. Mar. 29, 2024).

[3] Rose did not file a motion to dismiss before the district court.  Nor did the DCF defendants, who were only named in the amended complaint ten days before the district court dismissed that complaint in full.  As we discuss below, we agree with the

The district court dismissed the amended complaint in full. See Doe v. City of Bos., No. CV 23-11294, 2024 WL 1346018, at *2 (D. Mass. Mar. 29, 2024). As relevant to this appeal, it dismissed the § 1983 claims against the BPD and DCF defendants after rejecting the argument that these defendants violated the Does' substantive due process rights by affirmatively enhancing the danger they faced from Rose. See id. at *12-16. The court then dismissed the § 1983 claims against the City based on its conclusion that the Does had not alleged any underlying constitutional violation by any city employee, and thus they could not meet the test for municipal liability under Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 694 (1978). See Doe, 2024 WL 1346018, at *16.

As for the § 1985 claims, the district court concluded that the Does did not sufficiently plead that the defendants were motivated by class-based animus to conspire and deprive John and Jane Doe of their civil rights. See id. at *16-17. Lastly, because the court dismissed all the federal claims, it declined to exercise supplemental jurisdiction over the remaining state-law claims. See id. at *17.

The Does timely appealed.

_____

Does that the court should not have dismissed some of the claims against the DCF defendants without giving the Does an opportunity to be heard on those particular allegations. See infra Section III.A.1.

- 10 -

## II. STANDARD OF REVIEW

"We review de novo a district court's decision to grant a motion to dismiss under Rule 12(b)(6), reversing the dismissal only if 'the combined allegations, taken as true . . . state a plausible, not a merely conceivable, case for relief.'" Lawrence Gen. Hosp., 90 F.4th at 598 (quoting Lee v. Conagra Brands, Inc., 958 F.3d 70, 74 (1st Cir. 2020)). To determine whether the plaintiff's allegations are plausible, we "separate factual allegations from conclusory ones." Id. (quoting Conformis, Inc. v. Aetna, Inc., 58 F.4th 517, 528 (1st Cir. 2023)). We then "accept as true all well-pleaded facts alleged in [the Does'] complaint and draw all reasonable inferences therefrom in [their] favor." Id. (quoting Lanza, 953 F.3d at 162).

## III. DISCUSSION

The Does raise three arguments on appeal. First, they contend that the district court should not have dismissed their Fourteenth Amendment claims against the BPD and DCF defendants because they plausibly alleged that these defendants are liable under the state-created danger doctrine. Relatedly, they point out that the district court should not have dismissed all of their claims against the DCF defendants sua sponte, without giving the Does an opportunity to be heard.[4] Second, they argue that their

_____

[4] The Does do not challenge the dismissal of the Fourteenth Amendment claims against Rose and Frances.

Fourteenth Amendment claims against the City should have survived because they were injured by the City's custom of mishandling citizen complaints against police officers.  Third, they claim that the district court erred in dismissing their § 1985 claims on the basis that they are not members of a protected class.  We address each argument in turn.

## A. Section 1983 Claims

The Does allege that the defendants violated their Fourteenth Amendment substantive due process rights to "bodily integrity."  The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  To establish a substantive due process claim, the Does must show "a deprivation of a protected interest in life, liberty, or property" and "that the deprivation of this protected right was caused by governmental conduct." Rivera v. Rhode Island, 402 F.3d 27, 33-34 (1st Cir. 2005).  Here, the parties do not dispute that Rose deprived the Does of their liberty interest in bodily autonomy when he sexually abused them.  But they disagree on whether governmental conduct caused this harm and, thus, whether the defendants may be held liable for Rose's sexual abuse.[5]

---

[5] The Does brought their Fourteenth Amendment claims under 42 U.S.C. § 1983.  "[T]o state a claim under § 1983, a plaintiff must allege (1) the violation of a right protected by the Constitution

- 12 -

In particular, the parties dispute whether the defendants can be held liable for Rose's sexual abuse under the state-created danger doctrine.[6] The district court concluded that none of the Does' allegations were sufficient to state a valid claim under this doctrine against any defendant. But, on appeal, the Does contend that "[t]he [c]omplaint is replete with allegations of affirmative acts by the individual [defendants]" that could form the basis of a successful state-created danger claim.

We focus our analysis on four of the acts alleged by the Does against the BPD defendants because, as we explain below, we agree that those acts are affirmative and thus could potentially provide the basis for a state-created danger claim. Those acts are: (1) Sgt. Det. McLean and Lt. Donahue's decision to interview

_____

or laws of the United States and (2) that the perpetrator of the violation was acting under color of law." Cruz-Erazo v. Rivera-Montañez, 212 F.3d 617, 621 (1st Cir. 2000). The parties disagree only about whether the Does have alleged a constitutional violation; none of the defendants, other than Frances, dispute that they acted under color of law. And, as we noted earlier, the Does do not challenge the district court's dismissal of their Fourteenth Amendment claims against either Frances or Rose.

[6] The Does also argue that the district court erred by failing to consider their due process claims for the deprivation of their "right to court access," which are "[s]eparate and [d]istinct from [their] [b]odily [i]ntegrity [due process] claim[s]." But we see no such claims in their amended complaint. The ten counts alleging violations under § 1983 discuss only the Does' rights "to bodily integrity and to be free from deprivation of liberty without due process of law." Nor did the Does raise this court access theory to the district court in their motion to dismiss briefing.

- 13 -

John in front of Rose, his abuser; (2) Lt. Donahue's instruction to DCF not to visit Rose's home or reinterview John; (3) Superintendent-in-Chief Doherty and Legal Advisor Hatton's approval of vacating the restraining order against Rose; and (4) Commissioner Evans's decision to reinstate Rose to full duty.

We disagree with the district court that the Does' Fourteenth Amendment claims against the BPD defendants fail at the initial prongs of the state-created danger test. We also conclude that the court should not have dismissed the § 1983 claims against the DCF defendants without permitting the Does to address those claims in particular. Thus, we remand for the district court to re-evaluate the Fourteenth Amendment claims against the BPD and DCF defendants. And because the court dismissed the claims against the City on the ground that the Does did not allege a plausible state-created danger claim (or any other constitutional violation) against any city employee, we remand for further proceedings as to the Does' claims against the City as well.

### 1. State-Created Danger

As a general matter, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989). But when the state creates or enhances the danger to an individual from that private violence, then a due process claim may be available. See Irish v.

- 14 -

Fowler, 979 F.3d 65, 73-75 (1st Cir. 2020) (citing DeShaney, 489 U.S. at 201).

Before us, the Does do not challenge the district court's conclusion that Rose's sexual abuse constituted private violence falling under the DeShaney rule. They contend only that the district court should not have dismissed their Fourteenth Amendment claims because they plausibly alleged that the BPD defendants are liable under the state-created danger doctrine.

Our court first recognized a viable state-created danger claim in 2020 in Irish v. Fowler, joining nine other federal circuits at the time. See id. at 73-76. Under Irish, to state such a claim, a plaintiff must show:

> (1) that a state actor or state actors affirmatively acted to create or enhance a danger to the plaintiff;
>
> (2) that the act or acts created or enhanced a danger specific to the plaintiff and distinct from the danger to the general public;
>
> (3) that the act or acts caused the plaintiff's harm; and
>
> (4) that the state actor's conduct, when viewed in total, shocks the conscience.
>
> > (i) Where officials have the opportunity to make unhurried judgments, deliberate indifference may shock the conscience, particularly where the state official performs multiple acts of indifference to a rising risk of acute and severe danger. To show deliberate indifference, the plaintiff must, at a bare minimum,

- 15 -

> demonstrate that the defendant actually knew of a substantial risk of serious harm and disregarded that risk.
>
> (ii) Where state actors must act in a matter of seconds or minutes, a higher level of culpability is required.

Id. at 75.

Only the first and third prongs of the state-created danger test are at issue in this appeal. Under the first prong, a plaintiff must allege an affirmative act rather than a failure to act. For example, a government official who fails to conduct an adequate investigation or to intervene "when suspicious circumstances dictated a more active role for [the state]" does not engage in any affirmative acts. DeShaney, 489 U.S. at 197, 201, 203; see also, e.g., Johnson v. City of Biddeford, 92 F.4th 367, 378 (1st Cir. 2024) (concluding that an officer's "fail[ures] to inquire whether [a suspect] had access to a firearm, initiate a mental health intervention, or arrest or summons [him] for a criminal violation" were not affirmative acts). But actions such as contacting a suspect or promising to protect a victim from harm could qualify as affirmative, depending on the particular circumstances, and thus give rise to a state-created danger claim if they also enhance the danger the plaintiff faces. See Irish, 979 F.3d at 75, 78-79.

To determine whether an affirmative act enhanced the danger to the plaintiff under the first prong of the test, we

- 16 -

evaluate whether the act "render[ed] [the plaintiff] any more vulnerable to [harm]." DeShaney, 489 U.S. at 201. Critically, there is no need for the affirmative act to "greatly" enhance the danger. Welch v. City of Biddeford Police Dep't, 12 F.4th 70, 76 (1st Cir. 2021) (citing Irish, 979 F.3d at 75). For example, we have held that tipping off the suspect in a sexual assault investigation that the victim had filed a police report against him was sufficient to enhance the danger to the victim based on the circumstances of that case. See, e.g., Irish, 979 F.3d at 75 (adopting district court's reasoning for denying summary judgment), aff'g in part, 436 F. Supp. 3d 362, 415 (D. Me. 2020) (explaining that jury could find that officer's act of leaving voicemail for suspect enhanced danger to plaintiffs by causing suspect to "fl[y] into a rage" and "inflict[] significant harm on the [p]laintiffs"); Rivera, 402 F.3d at 37 (concluding that officers' unfulfilled promises of protection could enhance risk to victim if they "induced [her] into a false sense of security, into thinking she had some degree of protection from the risk, when she had none from the state").

The third prong of the state-created danger test then requires that the government's affirmative acts caused the plaintiff's harm. In Rivera, after concluding that the police officers' unfulfilled promises of protection to a testifying witness in a federal prosecution may have left her "more vulnerable

to . . . danger," we concluded that the plaintiff nevertheless could not satisfy the causation requirement. 402 F.3d at 37-38. As we reasoned, the promises in Rivera "did not deprive [the victim] of the liberty to act on her own behalf" nor "take away [her] power to decide whether or not to continue to agree to testify." Id. at 38.

In dismissing the Does' bodily integrity claims, the district court decided that their claims failed at either the first or third prong of the state-created danger test. Specifically, under the first prong, the court determined that "many" of the affirmative acts alleged were "not wrongful in any meaningful sense" and none "created or enhanced the danger to John and Jane" by "materially chang[ing] Rose's behavior or any of the conditions of the sexual abuse." Doe, 2024 WL 1346018, at *15. It then held that even if the last of the alleged acts, BPD Commissioner Evans's decision to reinstate Rose to full duty, did satisfy the first prong of the test, the Does' claims still would fail at the third prong -- the causation requirement. Id. at *15 & n.10. The court concluded that "there are no specific factual allegation[s] to infer that [this act] caused any of the alleged abuse." Id.

We disagree with the district court's analysis under the first prong of the state-created danger test and conclude that the Does plausibly alleged four affirmative acts that could have enhanced the danger they faced from Rose, which we previewed

- 18 -

above.[7]  However, we agree with the court's causation analysis as it relates to the final affirmative act, Rose's reinstatement at BPD.

We begin with the first affirmative act -- the BPD officers' decision to interview John in front of his abuser.  The defendants do not contest that this was an affirmative act and argue only that the Does did not plausibly allege that this act enhanced the danger John and Jane faced.  But we have held that even "the use of law enforcement tools," such as interviewing and subpoenaing witnesses, can give rise to a state-created danger claim when they are not "performed appropriately" or are "wrongful."  Irish, 979 F.3d at 75 (citing Rivera, 402 F.3d at 37).  In Irish, we concluded that a reasonable jury could find that a police officer enhanced the danger to the plaintiff when he left her abuser a voicemail requesting an interview because the voicemail tipped the abuser off to the plaintiff's police report.  See id. (adopting district court's reasoning); Irish, 436 F. Supp.

---

[7] The Does also contend that the St. Clair Report "establishes the requisite affirmative conduct by the BPD," so the district court erred by failing to consider its contents as providing additional facts supporting their state-created danger claims. But even assuming that the report was incorporated into the Does' amended complaint, we conclude that this argument is waived for lack of development because the Does do not explain how the policies and procedures outlined in the St. Clair Report amount to affirmative acts by the BPD.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

3d at 416. In so ruling, we distinguished the claims in that case from the ones we rejected in Rivera, because, in Rivera, the challenged law enforcement acts were "necessary steps of the investigation that could not reasonably be avoided and were performed appropriately." Irish, 979 F.3d at 75 (emphasis added) (citing Rivera, 402 F.3d at 37). In Irish, by contrast, the challenged act, although investigative in nature, was not "performed appropriately" because, in "context," "the manner in which" the police contacted the abuser to interview him "was wrongful." Id.; see also Irish, 436 F. Supp 3d at 416 (concluding that "the mere fact that the [officers] wanted to interview [the abuser] cannot be the basis for liability," but one officer's choice to contact the suspect "in a particular time, manner, and context" that enhanced the danger to the victim could constitute a substantive due process violation). In particular, we highlighted that the officer left the voicemail despite "having been warned about [the abuser's] threats of violence and [despite the officers'] own acknowledgement that contacting [the abuser] would increase the risks to [the plaintiff] and her family." Irish, 979 F.3d at 75.

Here, the "time, manner, and context" in which the BPD officers chose to interview John -- in front of Rose, who was arrested and served with a restraining order shortly afterwards -- plausibly increased the risk of harm to the Does and

- 20 -

could be wrongful. Irish, 436 F. Supp. 3d at 416. Just like we held in Irish that an officer could have enhanced the danger to the plaintiff by leaving a voicemail for her abuser, tipping him off to her police report, we hold that the Does plausibly alleged that the officers enhanced the danger to John by interviewing him in "a police car in front of Rose's house" while Rose was "standing outside" watching, thus tipping off Rose to John's report. After all, it was during this interview that John told the officers that Rose sexually abused him. And Rose was arrested by those same officers and served with a restraining order later that day. Further, although interviewing witnesses like John is a "necessary step[] of the investigation that could not reasonably be avoided," the Does plausibly alleged that doing so in this "manner" and "context" was "wrongful." Irish, 979 F.3d at 75. Like the officers in Irish, the BPD officers here harbored concerns that Rose could react violently -- but nevertheless decided to interview John in front of him. See id. A jury could find that conducting the interview in this way, despite other potential options, was wrongful precisely because doing so would foreseeably "increase[] [the child's] risk of further abuse." Lipman v. Budish, 974 F.3d 726, 746 (6th Cir. 2020) (holding that it was reasonable to infer that "interviewing [a child victim] in front of her alleged abusers

and asking about the source of her injuries increased her risk of further abuse").[8]

Moving on to the second affirmative act, we conclude that the Does plausibly alleged that Lt. Donahue enhanced the threat of harm to John and Jane by instructing the DCF defendants not to interview John and "not to go to the Rose home, as the allegation pertained to a Boston Police officer." To begin, according to the amended complaint, the directive not to interview John violated BPD investigative protocols. We have explained that, if a police officer's actions constituted "violation[s] of protocol and training," plaintiffs have a stronger argument that those acts "exacerbated the danger" they faced. Irish v. Maine, 849 F.3d 521, 528 (1st Cir. 2017); cf. Marrero-Rodríguez v. Mun. of San Juan, 677 F.3d 497, 502 (1st Cir. 2012) (citing the defendant's "violation of several training protocols" as a factor "in favor of plaintiffs' Fourteenth Amendment claim"). Further, it is plausible that the DCF defendants may not have consented to lifting the restraining order against Rose just two months later

_____

[8] In their reply brief, the Does cite Lipman v. Budish to contend that "[t]he allegation of John Doe being interviewed in the presence of his abuser, by itself, is sufficient to state a State Created Danger theory" and urge us to "follow the Lipman analysis and conclude that . . . Appellants have sufficiently pled State Created Danger against multiple BPD and DCF Appellees." But Lipman's broader holding is not dispositive here because the Sixth Circuit's requirements for a state-created danger claim differ from our own. See 974 F.3d at 744.

if they had interviewed John and heard directly from him about the abuse or followed up on leads that he could have provided. And, as we discuss below, lifting the restraining order plausibly exposed the children to more harm by emboldening Rose to escalate the abuse. Thus, the Does plausibly alleged that Lt. Donahue's directive to DCF left them "more vulnerable" to the danger they faced from Rose. DeShaney, 489 U.S. at 201.[9]

We also conclude as to the third act that the Does plausibly alleged that the BPD officers enhanced the danger John and Jane faced from Rose by approving the vacatur of the restraining order against him. Taking the allegations in the amended complaint as true and drawing all reasonable inferences in the Does' favor, as we must, it is plausible that doing so enhanced the danger to John and Jane by "embolden[ing] [Rose] to continue his abuse with impunity." Martinez v. City of Clovis, 943 F.3d 1260, 1273 (9th Cir. 2019) (holding that officer's praise of abuser

_____

[9] The BPD defendants do not contend that the district court dismissed the state-created danger claims against them on the independent ground that their directive to DCF was "not wrongful." Nor did the district court specify which of the affirmative acts it viewed as "not wrongful in any meaningful sense." Doe, 2024 WL 1346018, at *15. But to the extent that the district court concluded that the Does failed to state a claim because it was not "wrongful" for Lt. Donahue to direct DCF not to reinterview John or go to the Rose home, we disagree. We find that it is reasonable to infer from the Does' allegations that the BPD instruction was wrongful given that it focused on Rose's status as a police officer: Lt. Donahue instructed DCF not to undertake these steps because "the [sexual abuse] allegation pertained to a Boston Police officer."

- 23 -

as "good people" and order not to arrest him after plaintiff's domestic violence complaint could have enhanced the danger to plaintiff). According to the amended complaint, because the BPD defendants allowed Rose to "avoid[] . . . restraining orders," "Rose was emboldened and escalated his abuse against John Doe and Jane Doe . . . ."[10] To be sure, the complaint lacks some key details about the restraining order, including who filed it, its duration, and the BPD's role in vacating it. But, nevertheless, the Does have alleged that the BPD officers took affirmative steps to lift the restraining order and that their actions "emboldened" Rose to "escalate[]" the sexual abuse. The defendants provide no reason why those allegations are not plausible; whether the Does' allegations will stand up in the long run is a question for discovery.[11]

---

[10] Although DeShaney arguably involved similar facts to this case because the victim there also was a child returned to the custody of his abuser, here, a different outcome is warranted because we have concluded that the Does plausibly alleged that the BPD defendants' approval of vacating the restraining order was an affirmative act that enhanced the danger to John and Jane by emboldening Rose to escalate his abuse. Cf. DeShaney, 489 U.S. at 201 ("[W]hen [the State] returned [the child] to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all."); see supra Section III.A.1.

[11] We also conclude that, to the extent the district court counted this affirmative act as one of "many" that was not wrongful, we disagree with that assessment at the motion to dismiss stage. Viewing the facts in the light most favorable to the Does, they plausibly alleged that the BPD defendants' decision to approve

The district court did not reach the remaining prongs of the state-created danger test as applied to these three acts, nor did the parties address the remaining parts of the test in their briefs to us, so we will not analyze them on appeal. See García-Rubiera v. Calderón, 570 F.3d 443, 458 (1st Cir. 2009) ("Given the lack of briefing and the district court's silence on this issue, we conclude that the more prudent course is to remand to the district court for further proceedings . . . ."); cf. Welch, 12 F.4th at 77 (remanding for consideration of later prongs of the state-created danger test, "as we here address only the district court's error in evaluating the danger-enhancing prong"). Instead, we remand to the district court to perform that analysis.

We now turn to the final act at issue on appeal: Commissioner Evans's decision to reinstate Rose to full duty. The district court expressly characterized the reinstatement as an "act[] of affirmative conduct," consistent with the amended complaint, even though it ultimately concluded that the act did not "enhance[] the danger to [the Does]." Doe, 2024 WL 1346018, at *15 (concluding that "[i]t is true that the complaint does assert some acts of affirmative conduct by the

_____

the vacatur of the restraining order against Rose just three months after it was entered was wrongful, particularly given Rose's intervening arraignment for child sexual assault, the IAD's active investigation of those sexual assault allegations at that time, and the fact that the BPD defendants knew or reasonably should have known of Rose's failure to comply with the restraining order.

BPD . . . defendants," including "Commissioner Evans['s] reinstate[ment of] Rose to full duty in 1998.").[12] It then rejected the Does' claims as to the reinstatement under the causation prong. Id. at *15 n.10.

We agree with the district court that the Does did not plausibly allege that Commissioner Evans's decision to reinstate Rose to full duty in May 1998 caused any additional or worse abuse, thus failing to satisfy the third prong of the state-created danger test. According to the Does' amended complaint, Rose stopped abusing John after 1997, so Rose's 1998 reinstatement could not have caused additional injury to John. And the Does do not allege that Rose's reinstatement caused any additional harm to Jane in late 1998 or 1999, the final year he abused her, above and beyond the harm caused by lifting the restraining order. Thus, we affirm the district court's dismissal of the Fourteenth Amendment claims

---

[12] The BPD defendants dispute whether Commissioner Evans's reinstatement of Rose was affirmative, claiming that the district court "correctly found that [it], in context, [was] effectively [a] form[] of inaction." To be sure, the district court at one point stated that the reinstatement was "effectively [a] form[] of inaction" because it amounted to a failure "to take further steps to investigate or prevent Rose's return to the force." Doe, 2024 WL 1346018, at *15. But, ultimately, we understand the district court to have concluded that this act was affirmative, given its repeated characterizations of the reinstatement as an "act[] of affirmative conduct" and an "affirmative act[]." Id. at *15 & n.10.

against the BPD defendants based on Commissioner Evans's reinstatement of Rose to full duty.

* * *

To summarize our analysis of the Does' bodily integrity claims under the Fourteenth Amendment, we conclude that the Does plausibly alleged that three acts -- the decision by Lt. Donahue and Sgt. Det. McLean to interview John in front of Rose, Lt. Donahue's instruction to DCF not to interview John or go to the Rose home, and the BPD officers' approval of vacating the restraining order -- satisfy the first prong of the state-created danger test. We remand for the district court to apply the remaining parts of the test to these alleged acts under the Rule 12(b)(6) standard. Next, we hold that the Does did not plausibly allege that Commissioner Evans's decision to reinstate Rose to full duty caused them any additional harm, so we affirm the district court's dismissal as to that act.

Lastly, we agree with the Does that the district court should not have dismissed their Fourteenth Amendment claims against the DCF defendants sua sponte. See Doe, 2024 WL 1346018, at *2. "The general rule is that . . . '[sua sponte] dismissals [under Rule 12(b)(6)] are erroneous unless the parties have been afforded notice and an opportunity to amend the complaint or otherwise respond.'" Chute v. Walker, 281 F.3d 314, 319 (1st Cir. 2002) (quoting Futura Dev. of P.R. Inc. v. Estado Libre Asociado

- 27 -

de P.R., 144 F.3d 7, 13-14 (1st Cir. 1998)).  As a result, we vacate the dismissal of the Fourteenth Amendment claims against the DCF defendants.[13]

## 2. **Monell** Liability

Under Monell v. Department of Social Services of the City of New York, a municipality may be held liable for an employee's constitutional violation when that violation was caused by the employee's "execution of [the municipality's] policy or custom."  436 U.S. at 694.  Thus, to find that a city is subject to Monell liability, a court must first find that a city employee committed an underlying constitutional violation.

The district court never addressed whether the execution of a City policy or custom caused the Does' abuse because it concluded that the Does had not sufficiently alleged a constitutional violation by the BPD defendants or any other municipal employee (under the state-created danger doctrine or otherwise).  We therefore also vacate the dismissal of the § 1983 claims against the City and remand for the district court to

---

[13] Although the district court also dismissed the Does' § 1985 claims against the DCF defendants, that "sua sponte dismissal may stand" because "it is crystal clear that [the Does] cannot prevail [on those claims] and that amending the complaint would be futile." Chute, 281 F.3d at 319.  As we explain below, we agree with the district court that the Does failed to allege membership in a class protected under § 1985.  See infra Section III.B.

revisit the Does' Monell claims after re-evaluating their state-created danger claims.

## B. Section 1985 Claims

The Does alleged that the defendants violated 42 U.S.C. § 1985 by conspiring to intimidate John and Jane Doe and prevent them from testifying freely about Rose's sexual abuse and by conspiring to deprive them of their right to bodily integrity. Section 1985 prohibits conspiracies to interfere with civil rights by "(1) preventing officer[s] from performing [their] duties," "(2) obstructing justice [by] intimidating [a] party, witness, or juror," and (3) "[d]epriving persons of [their] rights" to "equal protection." 42 U.S.C. § 1985. The district court assumed that the Does brought their claims under subsections (2) and (3) based on the allegations made in their amended complaint, and so do we. It then dismissed the § 1985 claims on three independent grounds, finding that the Does did not plausibly allege a constitutional violation, or that John and Jane Doe are members of a protected class or suffered class-based discrimination, or that the defendants acted in a conspiracy. Doe, 2024 WL 1346018, at *16-17, *17 n.12.

On appeal, the Does challenge only the district court's ruling that they failed to state a class-based discrimination claim under § 1985(3). We agree with the district court, however, that the Does did not plausibly allege such a claim because they failed

- 29 -

to identify a cognizable class or any class-based animus. We do not consider the other grounds for the district court's decision to dismiss the § 1985 claims.

The Does concede that, to state a claim under § 1985(3), they must plead that the defendants acted based on "some racial, or perhaps otherwise class-based, invidiously discriminatory animus." Pérez-Sánchez v. Pub. Bldg. Auth., 531 F.3d 104, 107 (1st Cir. 2008) (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)). The Does do not claim to belong to a protected class based on their race. Instead, they ask us to recognize a new protected class under § 1985 of "victims of BPD's internal cover-up of BPD misconduct in the 1990[s]."

But the Does merely allege a narrow class of persons "similarly situated" to themselves, which is insufficient under binding precedent. See Harrison v. Brooks, 519 F.2d 1358, 1359-60 (1st Cir. 1975) ("The requirement that the discrimination be 'class-based' is not satisfied by an allegation that there was a conspiracy which affected the interests of a class of persons similarly situated with the plaintiffs."); see also Pérez-Sánchez, 531 F.3d at 108 (explaining that § 1985 was "intended to address racial animus first and foremost," so "not all clearly defined classes [are] covered by the statute"). The Does simply do not satisfy the statute's requirements of alleging specific facts to show that "the defendants conspired against the plaintiffs because

- 30 -

of their membership in [such] a class and that the criteria defining the class were invidious." Harrison, 519 F.2d at 1360 (emphasis added).

The Does nevertheless claim they can still prevail under § 1985 because recognition of their proposed class would not "open the federal courts to a wide variety of claims," citing Pérez-Sánchez. 531 F.3d at 109. But we did not recognize a new protected class in Pérez-Sánchez, let alone establish a rule that any class that does not "open the federal courts to a wide variety of claims" is covered by § 1985. Id. Doing so would risk transforming § 1985 into "a general federal tort law." United Bhd. of Carpenters v. Scott, 463 U.S. 825, 834 (1983). Instead, in Pérez-Sánchez, we noted that this floodgates concern was one reason why we declined to recognize the proposed class. See 531 F.3d at 107-09. And we reiterated that the U.S. Supreme Court has held that "not all clearly defined classes [are] covered by the statute." Id. at 108 (citing United Bhd., 463 U.S. at 835). Thus, we affirm the district court's dismissal of the Does' § 1985 claims.[14]

_____

[14] The Does also argued that the district court erred in dismissing the §§ 1983 and 1985 claims against the BPPA "without proffering any reason for the dismissal." But the amended complaint did not include § 1983 claims against the BPPA; it only included § 1985 claims. And, on appeal, the Does challenge only the district court's ruling on their § 1985(3) claims. As we describe in this section, we agree with the district court's

- 31 -

## IV. CONCLUSION

For all these reasons, we **vacate** the dismissal of the Does' § 1983 claims against the BPD and DCF defendants and the City; **affirm** the dismissal of the Does' § 1985 claims against all the defendants, as well as the Does' § 1983 claims against Rose and Frances; and **remand** to the district court for further proceedings consistent with this opinion. The parties shall bear their own costs.

---

decision to dismiss the § 1985(3) claims on the ground that the Does did not sufficiently allege that they are members of a protected class. This rationale applies to the § 1985(3) claims against each defendant, including the BPPA.